Case No. 15-1204 at Elm, 800 River Road Operating Company, LLC, Viewing Business at Woodcrest Health Care Center, Petitioner, v. National Labor Relations Board. Mr. Gershegorn for the Petitioner, Ms. Von Wilpert for the Respondent, and Ms. Hansen for the Intervener. Good morning. Good morning, Your Honors. May it please the Court, my name is Brian Gershengorn. I represent the Petitioner, 800 River Road Operating Company, LLC, Viewing Business at Woodcrest Health Care Center. One of the primary purposes of the Act and the Board is ensuring that employees can freely choose their own collective bargaining representatives. In this case, Woodcrest was denied a full and fair hearing as to whether supervisors committed objectionable conduct and coercive pro-union activity that tainted their election. More importantly, Woodcrest employees were denied the ability to participate in an election free of coercive conduct. Woodcrest and its employees were denied this right by three egregious errors. First, and frankly the most egregious, while the Board recognized that the hearing officer erred when he failed to perform the ministerial act of providing subpoenas to Woodcrest, ex parte or otherwise, it then went on to simply conclude with next to no analysis that this action was nothing more than a harmless error and simply affirmed the hearing officer's ruling. Second, the Board affirmed the hearing officer's decision to not allow Woodcrest to question eight witnesses it had not quote unquote vetted prior to the hearing and thus could not proffer an offer of proof as to their testimony. Again, by the Board with little to no analysis, while not considering the fact that Woodcrest was not permitted under Board law pursuant to Johnny Poultry to question these individuals. So I don't understand that argument, just so I'm clear on Johnny's Poultry. I don't read it as giving the employee a Fifth Amendment right not to talk to the employer. As I understand, the Board was saying that the burden is on the employer to say, I want to talk to you, Mr. or Mrs. Employee, but anything you say, I'm not going to hold against you. I'm just trying to find out the facts. You shouldn't view this as a coercive investigation and there will be no negative ramifications as to you. And in your case, the employer did interview over 100 employees. Isn't that right? So, I mean, saying Johnny's Poultry, I didn't quite understand that argument. Well, Your Honor, I understand your point on Johnny Poultry not being a Fifth Amendment right. I think what Or TAN amount to, yeah. Correct. I'm sorry. What Woodcrest would maintain is that it did approach these specific eight individuals whom they selected as having the most knowledge of what this alleged coercive activity was going to be. Those individuals, specifically those eight, exercised their Johnny Poultry rights not to talk with the employer or its representatives. And so what the hearing officer did was put a vetting requirement upon Woodcrest to say, you need to let me know what these witnesses are going to say. So, I understand the hearing officer to have allowed circumstantial evidence to show the relevance of witnesses that the employer wanted to call. He didn't have to talk directly to the employee, but could offer, as he did in some instances, or it did in some instances, circumstantial evidence. Well, I think it's all under the backdrop, Your Honor, of this was a day and a half into the hearing, specifically at a lunch recess. The employer, based upon the evidence that was elicited up until that point after a day and a half of the hearing, had requested first and foremost these six subpoenas to call the very individuals who were the subordinates of one of the alleged supervisors who was allegedly engaged in this coercive election activity. Who had, what, 22 or 24 employees under him? That's correct, Your Honor. And what Woodcrest had did was identified the six who were particularly under Mr. De Dios, the one particular supervisor, and said to the hearing officer, we would like these subpoenas to be issued. So I understand your argument about you get to try your case the way you want to in the order of witnesses, et cetera, but every time a representation was made that these witnesses were going to have something relevant to say, they didn't. And so after a day and a half, how long is the hearing officer supposed to sit there without some reasonable proffer? That understood, Your Honor, and what Woodcrest was attempting to do specifically with the six subpoenas, because as far as Woodcrest maintained, and we note in our brief, the four supervisors that we called only within the day and a half of the hearing, not surprisingly, did not admit to the coercive activity. So what about these five witnesses that the hearing officer was ready to hear from? In regards to their testimony? Yeah, and your client said, we're withdrawing from the hearing. And based upon, and the reason for that, Your Honor, was based upon the evidence solicited only after a day and a half of the hearing when Woodcrest was shut down by the hearing officer. No, there were five witnesses. Understood. That's what I want to know. What about that? Well, what Woodcrest... I mean, you can't create the error yourself, can you? And then come to the court and say, you weren't allowed to call witnesses, and there were five people that you didn't hear from. Well, Woodcrest wasn't looking to create the error. We did have those five additional witnesses. No, but I'm getting at the point that the board said it's harmless error. You want to focus on the violation about the subpoena should have issued. The board said, well, even if they had issued, the hearing officer, having sat there for a day and a half, was going to require some proffer that these witnesses were going to have some relevant evidence. Right, and, Your Honor, what Woodcrest would maintain is, based upon Judge Brown's opinion in manner of care, that this wasn't harmless error. Well, is manner of care what says that the board's response was too summary? Yeah, that's correct, Your Honor. And I think specifically that while there's a deferential standard, it's not meaningless. And here, what the board... Also, just so we're clear, Judge Brown is writing for the court, so it's the court's opinion, all right, in manner of care. And I just want to understand why you think that entitles you to get a grant of the petition here. Because what the board did here was nothing more than rubber stamp the hearing officer's determination that he failed to, while acknowledging that it's ministerial in nature and pursuant to the act itself, the hearing officer needed to issue the six subpoenas. In fact, the Supreme Court has spoken about this issue in Lewis v. NLRB and has said, this is a ministerial procedural aspect. The subpoenas must be issued in a representation hearing. So the question is, the board says, in terms of discussing the last case, plain error by the hearing officer. And your argument is that the board should have spelled out in more detail why it was harmless error? That's correct, Your Honor, because if the board acknowledged, the board, in fact, acknowledged in its rather brief decision that the hearing officer made an error. The subpoenas should have, in fact, been issued. So there is no concept of harmless error in board proceedings? No, there could be a harmless error, Your Honor. But here, specifically, what Woodcrest and the reason Woodcrest wanted just these six particular subpoenas to issue. And one of the arguments, interestingly enough, that the union makes in its papers, and we note this in our reply, is the union acknowledges that Woodcrest needed these six individuals. No, I understand your argument there. But let me just say, in your brief, you make representations about what these witnesses would testify to. And what's the basis that you're making those statements? Well, Woodcrest maintained, and we had made this argument to the hearing officer as well, was that while this is what we understood these particular witnesses would testify to. Now, who knows, at the end of the day, what the individual witnesses would have actually testified to? What was the basis for your understanding? What was the factual basis for that understanding? The basis was, Your Honor, that these were the employees that the company was hearing from, vis-a-vis the individuals who were subordinate to Mr. De Dios. I understand that answer. You had 24 subordinates, and you carved six out and said you had a reason to believe that they would have testimony about his misconduct as a supervisor. Are you saying that the only basis for that reason to believe was that they were his subordinates? I think that is one of the main reasons. No, not one of the main. Then what are the other ones? I would say that that is the reason, Your Honor. So if you had asked for 24 subpoenas, one for every single subordinate, that would have had to have been allowed as well. Well, and I think there is an important distinction, Your Honor, and the board and the hearing officer addressed this, and the company did not go through, as the hearing officer said, the entire Excelsior list. We made it narrow. You didn't. I'm just asking you your legal position. If you had, because you don't know what they're actually going to say, I think all you've got is that they work for this person whom you suspect of having engaged in misconduct. So on what legal basis could we write an opinion that says you have to issue six? That's not, that can't be harmless, but you don't have to issue 24. That would be harmless. Well, and I understand the court's question, and I don't think that there is a specific threshold. However, in this particular instance, Your Honor, we weren't allowed to talk with one of them, and maybe what the hearing officer should have done was permit a limited number, but he permitted zero. In light of the law that clearly says the subpoenas have to issue, the board took it a step further by saying it was harmless error, but in fact the board doesn't even address the concept. I'm sorry, the board said it was harmless error and said even if the subpoenas had issued, they would have been revoked. Well, that's because the subpoenas may have to issue, but the testimony doesn't have to be allowed. Is that correct? I'm trying to make sure I understand actually how this whole process works. That is correct, Your Honor. And going back to the court's decision in Manor Care authored by Judge Brown, it's not the fact that the subpoenas may not have – could have actually been revoked. It's the fact that the board in its decision gave absolutely no ink to the concept of what it even means to have revoked a subpoena. Woodcrest maintains that – Gave no what? But the board, I thought, said – It just said it. That that's ink. But all the board did was say it. They gave no – It just said it. I thought – it's just been – it seems like a crazy process because you can't figure out – the only way you can figure out what they say is to call them, so you have to be allowed to call them, but then if you don't know what they're going to say, you don't – anyway, I just don't understand how this whole thing works, but if the board's rationale was this, okay, had to issue the subpoenas, but didn't have to allow the testimony in, and was within its rights after you had paraded ten witnesses before it, none of whom – it might be only one of whom, but virtually none of whom had anything to say directly about the issue to support your position. And at some point, the board was allowed to say that – the hearing officer was allowed to say, you know, if you want to bring more people in, you've got to have some basis to think – to understand that they're going to say something favorable other than they worked there at the time of the election. And so I had understood the board's decision to be harmless in that sense. Yes, they should have done the subpoena, but there was no obligation at this point, after a day and a half, nothing at all coming forward to let them testify. That's why it was harmless. That seems like an explanation to me. It's obviously one you disagree with, but I don't think the problem is lack of an explanation. Well, and I think the reason we disagree with it, Your Honor, is that in order for a subpoena to be revoked, the subpoena requests evidence whose production doesn't relate to any matter under investigation. And what Woodcrest was wanting with the issuance of these six subpoenas was to allow for testimony of the very employees who were the subordinates to Mr. DiDios. I'm just not sure. I don't know on what basis we could say six rather than 12 or 24. And I get that you didn't, but given the nature of the argument, on what basis would we say six but not all? Well, and I think the answer there, Your Honor, is that regardless of the number, the testimony of these six individuals was central or at the heart of Woodcrest's case, which is whether or not the supervisors were actually engaged in coercive pro-union conduct. And the best way, frankly, for Woodcrest to be able to establish that is to question the very individuals, the subordinates of Mr. DiDios. We weren't afforded that opportunity with even one. The hearing offer simply said no, and the Board simply affirmed it without going through the fact of whether or not it was proper to call that harmless error and going through why the subpoena would have been revoked. Woodcrest maintains the subpoena wouldn't have been revoked because the individual's testimony went to the heart of the issue of what Woodcrest was trying to demonstrate here. I see I'm well over my time, but I'm happy to answer your questions. All right. Thank you. We'll hear from counsel for the board. Thank you. Morning, Your Honors. May it please the Court. My name is Marnie Von Wilpert, and I represent the National Labor Relations Board. Your Honors, in this case, Woodcrest always had the burden to prove objectionable conduct, to overturn a validly conducted board election. We gave Woodcrest plenty of opportunity. Okay. Let me just ask, under the board's rules and manuals of procedure, there is no pre-hearing discovery. Is that correct? That's correct, Your Honor. So there's a Johnny Poultry's right, and if the employees, for whatever reason, say to the employer they do not wish to discuss what they might testify about at the hearing, the only way to find out is to hear from them? No, Your Honor, that's not quite right. You're correct with Johnny's Poultry that employees can refuse to be interviewed about the union activity in the election. However, supervisors under the Act are not employees, and they do not have the benefit of Johnny's Poultry. So oftentimes, employers will interview supervisors who, especially when the company is conducting a unions avoidance campaign, are on alert to watch for union activity, and that is how they get most of their evidence. That happened here. But here, they had one employee supervisor who testified to some, what, third-hand information about these, or one of these other four supervisors, right? Which employee, Your Honor? They had a couple of employees testify. Well, it's the witness who gave second- or third-hand information. She had heard somebody say that somebody said that somebody said that. Yes, Your Honor, that was Ms. Lori Sink, the Wilcrest administrator, and she said that Susan Langdon, another supervisor, who, again, does not have Johnny's Poultry protections because she's a supervisor, had directly seen an employee, Ramey Sajimi, speaking with one of the alleged supervisors, Ms. Cadero, about the union. But what I'm trying to understand, if your target is the supervisors, presumably the supervisors are not going to tell you what you want to hear. The four supervisors? Yeah. But others will, and others did, as Wilcrest's attorney proffered. We have the example here of Ms. Ramey Sajimi, who was an employee, who, Wilcrest said, exercised her Johnny's Poultry rights not to speak. Yeah, Wilcrest was able to obtain enough information to get her into the record to testify because they said, well, we talked to a supervisor, Ms. Susan Langdon, who said she saw her speaking about the union with one of the four alleged supervisors. It is curious, though, why they didn't call Ms. Langdon herself, because she could have provided that testimony, yet they didn't call her. Did they provide testimony about Virgil de Dios? Ms. Langdon? Yeah. The record doesn't state that, Your Honor. So how are they supposed to prove this claim as to Virgil, I don't know if I'm saying that right, Virgil de Dios? Virgil de Dios, yes, ma'am. Well, the union, I'm sorry, the employer already said that it had witnesses when it came to the RD. It said, we have a regional director, we have several witnesses who will testify to Virgil de Dios' conduct. So they already said they had them. Second, one of the five witnesses that was supposed to be scheduled for Monday, and this is on Joint Appendix 316, 317, the attorney said of the five witnesses who had not been vetted, the fourth will testify that Israel told employees, word to the effective, vote what your heart tells you. So they clearly had the proof, and Monday morning, the hearing officer opened the doors, the court reporter showed up, we were ready to hear the five scheduled witnesses, one of them who had information about Virgil de Dios, apparently, and they didn't bring them and said they walked out. So it's not as if the board didn't give them an opportunity here. And another way to get information without directly interrogating employees is by subpoenaing documents. You can subpoena documents before the hearing. Employers usually know when these union activities are happening, such as flyers on bulletin boards, where they see employees' pictures in the bulletin boards, they often subpoena those. The argument was that the supervisors had said things that rendered the non-laboratory setting for the election. So that's not, unless they did it by e-mail, it's unlikely you're going to have documents. Yes, Your Honor, in this case, that's true. I was just trying to answer the broader question of how they could get discovery. But the main point with this case is that in order to get this evidentiary hearing after the union won the election, on J.A. 5 and 6, Woodcrest affirmatively stated to the regional director, the employer provided names of several supervisory and union employees, who the employer contends will testify that the supervisors actively and frequently solicited union cards. I look at that document and I'm surprised there's nothing more than just the bald allegations, unless there's some part of the document we're missing. And so I'm trying to figure out, I'm not sure that's saying anything that they weren't saying when they said, yeah, but we think someone's, we think one of these folks is going to have to say it because we believe it happened. Yes, Your Honor, that's simply a proffer from Woodcrest Council. There's no evidence to support that. And all that does is get them into the hearing, and then they have to actually produce it. I guess I'm very confused when you look at that, because that proffer goes on, and then there's some counts as to which they have lists of people that they're proffering. And as to those, the regional director goes, no, there's no there there, and we're not going to have a hearing on those. But then as to this one where they just had this sort of flat allegation, without any identified individuals or identified content of testimony, the regional director thought there was no such thing. Is there another document that was attached to that that spelled things out? Yes, Your Honor, there is, but that's specifically not part of the record here, because that information is not shared with the hearing officer or board counsel or anyone. It's only given for the regional director's eyes only, and that's because by our rules and our case-handling manual, we do not want our hearing officers to be prejudiced before they come in. And so the hearing officers are not allowed to see that document where the attorneys have laid out what the witnesses will say and who they will speak about, but the regional director gets to see that. And they get to determine, based on those proffers, that's all they are. They're not accompanied with evidence or affidavits, if there's enough substantial issue of fact to be done at the hearing. And so, as Your Honor brought up earlier, in the employer's brief, the employer mentioned multiple times, one example is on page 53, that these eight witnesses would have testified that Lewis, Thornton, and Cordero were actively distributing union authorization cards and Corsi's employees, and they cite to J.A. 5 and 6, which is their proffers to the regional director. So all they're citing for these affirmative declarations that they know what these witnesses would have testified to are their own earlier proffers, which were unproven at the trial. We pointed out in our brief, for example, on J.A. 311 through 313, that Mr. Mendelson, Woodcrest attorney at the trial, told the hearing officer, well, I don't mean to tell you what these eight people have, because I can't affirmatively assure you what they've said, since I couldn't talk to them. So I don't understand why, in their brief, Woodcrest is now claiming they know what these people would have testified to, where at the trial, they couldn't make an offer of proof. Under this court's, the board's hearing officer's decision, after ten witnesses came in, to ask, you know, can we have some offers of proof for five witnesses, is consistent with this court's precedent. In both SSC Mystic and in Salem Hospital, this court said that in order to find reversible error with a subpoena decision, the company has to show it was prejudiced by the decision. And in Salem, this court found that because Salem, I quote, failed to either make a proffer or to provide any other specific evidence of potential witness testimony, we cannot determine that the excluded evidence was either relevant or material. And under SSC Mystic, this court said if the company can't show that the excluded evidence was relevant or material, we have no basis for prejudice. What about the fact that the hearing officer kept saying, not just I want a proffer of evidence, I want a proffer of direct knowledge? Your Honor, that's also... And that's contrary. It doesn't have to be direct knowledge. Why can't they have indirect or circumstantial knowledge coming from these witnesses? Because, Your Honor, under this court's precedent and the board's precedent, hearsay and circumstantial evidence standing alone is not enough to overturn a validly conducted board election. So in Amalgamated Clothing Workers of America, which is in our brief, 424 F2D 818, this court said specific evidence of improper conduct that materially affected the election results must be provided. And in Sitka Sound Seafood, which we also cited, this court said this burden cannot be met by nebulous and declaratory assertions. Only specific evidence of specific events about specific people will do. And there's a reason for that. The employees here voted 122 to 81 for this union. And to overturn that... Specific evidence and direct knowledge, the same thing? Why couldn't they have... If you had seven employees came in and they offered circumstantial evidence, one by one it wasn't... But collectively, wow, everybody says they saw this. And it sure looked like they were handing out a union card, but I saw it from this angle and I saw it from that angle. Everyone saw circumstantial evidence, but collectively the picture was pretty clear as to what had happened. You say that would not be permissible. It's fine to say we get to exclude all that. Someone has to come in and only say they know directly what happened. Well, Your Honor, I can't speak for what the board might do in that situation. No, but you have a hearing officer here who said repeatedly that the reason your proffer's deficient is you're not telling me these folks have direct knowledge. And I don't know why the hearing... You could end up saying, argue that they didn't come at the end of the hearing. It didn't add up to enough specific evidence to establish a showing. But I don't know why they have to show... They can only put on witnesses that have direct knowledge. Is there case law from us saying or anywhere saying that they can only put on witnesses that have direct knowledge? I do not have a case to support that right now. I'd be happy to look and submit one after oral argument today. But the hearing officer, after hearing 10 witnesses and little evidence to corroborate even their indirect knowledge, Ms. Sang testified about what Ramey Sujimi would know, and Ramey Sujimi came on and said that's not true at all. I mean, the hearing officer here never once actually required them to speak to their witnesses. That's something that the company has attached to what the hearing officer said, but he never once said, I need you to speak to them before they get on here. Now, in their reply... Well, that's saying you haven't vetted them and you don't know that they have direct knowledge. What else could that mean? What else could it mean? But you need to have talked to them and tell them what they're going to say, and it better be spot on. Well, Your Honor, here we had a missed opportunity for Susan Lanca to testify, who said, I overheard and I saw the conversation between Ms. Cordero when she was instructing Ramey to attend a union meeting. That would have been direct knowledge because she saw it occur. She was right there and she heard one of the supervisors say it. They didn't bring her here. That would have been acceptable because that's actually the proffer that got Ms. to Virgil de Dios. To Virgil de Dios? No, Your Honor. But here, the company has not shown any evidence that Mr. de Dios actually engaged in objective conduct. Well, that's their whole argument is how are we going to do it? The question is the supervisor coerced his employees, and you won't let us call any of his employees. But they haven't... Surprisingly, he did not admit on the stand to having done it. Yes, Your Honor, but there's no evidence whatsoever he made these statements. All we have is the company's assumptions that he did. I think what all the questions are really trying to get at here, and it's really puzzled me, is I don't understand how this process works. The employer has the burden, right? Yes, Your Honor. And they're told that over and over, and yet there's no pre-hearing discovery, really. Yes, Your Honor. They, you know, if they don't have management employees who are willing to testify, if they need information from an employee, they can't really directly elicit that information because they have the right not to talk to them. So, and then there's a discussion that says, well, it can't be a fishing expedition. Yes, Your Honor. It seems very circular. I mean, how do you do this if you're trying to find out something from people who are not management employees, and you can't talk to them, or they can refuse to talk to you, right? Yes, Your Honor. And you have to make a proffer, but you are, in fact, saying, since I don't have any advanced knowledge of what they would say, I can't tell you. So, it seems sort of tautological. How are you to meet that burden if that's really the rules, other than putting these people on and exploring what they have to say? Well, Your Honor, first, that would assume the perfect situation that every employee refused to speak to the employer, which one was not the case here. They interviewed over 100 employees. In most cases, this Court has seen, the employees who have been threatened have testified themselves because they want to. In manor care, we had employees testify and say, I heard the threats. Same thing in, I'm sorry, I've lost my citation. But, no, I understand what you're saying. It may often be the case that things happen, and employees are upset by it, and they may have said something to somebody else about their concern or whatever. So, you can get at it in other ways, even though it may be somewhat attenuated. But here, if you have a situation where you're trying to show that the supervisors themselves did something inappropriate, and you can't count on the supervisors to confess that they did, right? They have no reason to do that. And perhaps the people who work for them don't want to get involved, right? They may have reasons not wanting to testify about their supervisor. So, it's an odd circumstance. I can't figure out how you do this unless you can get somebody to talk to you. Well, Your Honor, the employee will have to have heard that something happened in the first place. I mean, they can't just assume that there was a bad statement. So, an employee would have had to have spoken up. Someone must have overheard it. How else would the employer know to even ask those questions if someone hadn't spoken up in the first place? Well, I think the other aspect of this to remember is, this is in the context of a procedure for arranging for an election. So, there are procedures. And here, there was a stipulation by the employer and the union as to how the election would be conducted. And so, both sides can have poll watchers or whatever you call them. Yes, Your Honor. And they can complain to the regional director if they want something done differently, etc. So, if you're going to overturn the election, there's a greater burden than simply to say, well, I didn't like the outcome and I want to have a hearing. Yes, Your Honor. So, as I understand what happened here is there were objections raised. Two of them were found by the regional director to warrant a hearing. Yes, Your Honor. So, that gave the employer the opportunity to present the witnesses who apparently the employer had convinced the regional director could substantiate the objection. Yes, Your Honor. So, the hearing is held. The supervisors testify. Who else testified at this hearing? There were six other people who testified, three of whom were not employees during the election. They were these consultants, right? One was a companion of one of the patients who would walk the patient in and out of the center. Another was a director of nursing who had been terminated six months before the petition had been filed. And under board law, we only look at the critical period between when the petition was filed and the election. So, it's unclear how someone who had been fired six months earlier would have knowledge. And the third, Ms. Frost, Catherine Frost, she had been terminated six months before the election petition had been filed, yet they questioned her at length on the record. Mr. Cartney testified. He was an active employee, but he said he hadn't heard anything about anyone doing pro-union conduct except he heard Ms. Lewis was the person to see to get union cards. Didn't say who told him, didn't say when that was, except that, oh, it was before she was a supervisor. And then Ms. Ramey Sajimi testified that she'd never been coerced by any supervisor, let alone heard of any pro-union conduct. So, those were the other six people they brought in, in addition to the four supervisors. So, do you know if the interviews of the – how many employees did they interview, 100 to 150? Yes, Your Honor, that's what they asserted in their motion to reopen the record. To do what?  That's right. Yes, Your Honor. Do you know if those interviews occurred before or after the presentation of objections was made to the regional director or the acting regional director? I believe – and may I get my other – That's all right. The employer can probably – I believe they said, and you can correct me if I'm wrong, that it was within the first couple days after the election results came out, so before. And one of them had testimony. The only testimony they found, or the only witness they asserted, could talk about Virgil de Dios's objectual conduct wasn't even one of his employees. It was a union nurse. And she said, oh, yeah, I did hear him maybe talking to four employees who I couldn't identify their last names about the union. She wasn't even his subordinate. And this is someone who had cooperated fully in a post-election interview, but the company said, well, we didn't – we forgot to ask her about Virgil de Dios. And so we're asking her now, can we reopen the hearing three months later? And that's the reason the board said it wasn't even discovered evidence, because through due diligence they could have found that earlier. Your Honor, here, even in their first witness, Ms. Louise Chase – I'm sorry. Ms. Chase came in, didn't have any information about what had happened because she was not actually working at the facility. The employer said, you know what, Your Honor, I haven't met this witness. Can I please use a hostile witness questioning? They had an excuse for Ms. Stank, too. After Ms. Stank testified, and they let her go through the entire Excelsior list on the stand, flipped through the 250-employee Excelsior list to see if it triggered her memory. She's the employer's administrator. She had no reason not to cooperate. At the end of her testimony, Mr. Mendelson said on the hearing to the hearing officer, I told you we weren't prepared to go over with this witness either. I mean, they have excuse after excuse here, and they've come to this court and tried to overturn this election even though on Monday morning we gave them an opportunity to actually present direct evidence, and they failed to do it. So I see my time is up. They have not shown prejudice to overturn this ballot election. Do you have any other questions? Thank you. Thank you. Thank you. May it please the Court. Katherine Hanson for Intervenor 1199, SEIU, United Healthcare Workers East. The National Labor Relations Board has decided, and it has been, you know, widely accepted by this court and every other one that I'm aware of, that agency hearings cannot be used to fish for possible misconduct that could have upset an election result. And the employer in this case concedes that's exactly what they were doing. We couldn't speak to these employees. How did we know what they were going to say? We had to use the agency's subpoena power to force them to come and, under the power of the agency, be interrogated on the stand just to see if maybe they have something to say that's relevant. And it is a very rational interpretation of the act to say that's not what post-election hearings, or any other hearing for that matter, are for. That's not what we're going to use our agency resources to allow an employer to fish for information. The employer here could not make the most of it. Do you agree that the employer, once the employer questioned, before the hearing questioned these employees, and they said, I don't want to talk about it, that the employer had no ability to press further? Not with the employees, yes. And that's a protection. And I just want to clarify, Johnny Poultry's, the National Labor Relations Act prevents interrogation of employees about protected activities or conduct after an election. Johnny Poultry's creates an exception for the employer that allows them to actually interrogate employees, but it makes them provide certain protections. I'm telling you this is voluntary and there will be no reprisals. So it actually allows the employer to even have these interrogations in the first place. I'm getting something confused. So if the employer gives these warnings and rights, statement of warnings and rights, then can the employer say, when they go, I don't want to talk about it, can the employer say, no, look, again, I'll repeat your protections and whatnot, but I really do need to have you answer this question. No. The employee's participation is voluntary. And what the employer would ask this court to decide is that, okay, well, what we mean by that is you can't interrogate them privately. You can bring them to an agency hearing and interrogate them under the subpoena power of the board. And what this court has said is you can't fish for evidence. That's not what hearings are for. As to the 150 employees who were interviewed, do we know anything about what they said or did not say in this record before the court? We know that none of them had any evidence of objectionable conduct that the employer could proffer. The employer could not make any proffer. I don't think you understand the point of my question. Judge Millett's question was premised on the assumption that the employees would not talk. And I wanted to be clear as to whether there's anything in the record saying that. Maybe every employee talked and said, purest election process I've ever seen. Right. I don't know. But do we know? And certainly the employer hasn't proffered anything. Indeed, he puts up Johnny Poultry as this bar when it's not a bar. That's right. And the employer makes representations at the hearing, and this is in the record, that some of the employees did talk. And the only reasonable, I think, conclusion to draw from that is the employees who did talk, there's no breakdown of numbers, didn't have any evidence of objectionable conduct. And so the employer's solution was, well, then let's call the rest of them to the hearing and see if anyone has anything to say. And that the NLRB has rationally decided that that's not a proper use of agency resources for a number of reasons. The employer could not make the most basic proffer in this case. So discussions about whether or not the hearing officer made some heightened vetting requirement, I think, is, number one, not supported by the record. What about the hearing officer's direct evidence statements? I would point the court to, I think a reading of the record makes it very clear that the hearing officer said, tell me what these people are going to say. Do you have any reason? What is your reason for thinking these employees are going to have anything relevant to say? And as counsel said today, well, they work for Virgil De Dios, so maybe they know something. And the hearing officer said, I am not allowing, I will not allow that kind of testimony. And that's exactly what the board said in their decision. They said the hearing officer acted properly to shut down testimony that was clearly exploratory in nature and to prevent this from becoming a phishing expedition. There's numerous places in the record where the hearing officer says, why do you think they're going to have something to say? Give me anything that I can hang my hat on that they're going to have something relevant to say. So Jamie was allowed to testify based on circumstantial and hearsay evidence. The employer said, we haven't spoken to this witness, but someone told us that they overheard this conversation. And the hearing officer allowed their testimony, completely hearsay testimony. J309, hearing officer, my inclination is that there is nothing that Ms. Fizio, if I'm saying that correctly, is going to tell us that there's no direct knowledge, there's no facts that she has. J320, what I'm saying is that if you don't have any knowledge, I mean, she does not have any factually based direct knowledge about the objections themselves. My response would be that would be prejudicial if the hearing officer presented testimony. It could arguably be prejudicial if the hearing officer had presented testimony with lesser proffers. You know, if the employer said, look, I have circumstantial evidence, it's hearsay, but this is what I think this person's going to say. And the hearing officer said, nope, I need you to make a proffer of direct, specific, evidence-based testimony. The hearing officer, the employer, any proffer the employer made beyond, well, they work for Virgil de Dios, so maybe they have something to say. Any lesser proffer the hearing officer allowed. There were 15 witnesses that the hearing officer was prepared to hear from and anyone else for whom the employer could make the most basic proffer. So, you know, I have JA303, attorney says he doesn't know what the employees are going to say. They believe because they're union supporters, they might have something to say. JA309, the hearing officer asks, why do you think they have any knowledge? The employer says because they're union supporters. JA344 to 346, the hearing officer makes it very clear that he's not going to allow witnesses testimony for whom no proffer can be made. I think the record does support a finding that the hearing officer just needed a basic proffer. Again, on your 304, hearing officer, about line 78, you do not know whether or not they have actually based firsthand knowledge. The difficulty is that maybe somewhere the hearing officer said one thing and somewhere the hearing officer said another, but an awful lot of times the hearing officer said direct knowledge is what I want. And the employer never said, I don't have direct knowledge, but I have circumstantial hearsay knowledge. Never. They admitted, and they've admitted today, they didn't know what these witnesses were going to say. There's no prejudice if they were prevented from calling witnesses who just worked there. Right? The employer has a burden to establish prejudice, and as this court said in Salem, it's only prejudicial if there's a reason to believe that relevant testimony was excluded. And here, truly they wanted to call witnesses only. But in Salem it was admitted to be cumulative. I've got more people going to say the same thing. Here it's, I haven't had anybody yet who worked for Virgil de Dios who has been, I've been able to call to this day. There's no reason they could not have called them as one of their 15 witnesses. But they admitted that they didn't have any reason to believe these employees were going to have any relevant testimony. They could have called any one of Virgil de Dios' employees if they could have made the most basic proffer. Someone told me that somebody heard this. Someone overheard this. One of the ones that we did interview and who spoke to us, and, in fact, in the record, they did speak to some of these additional, some of Virgil de Dios' witnesses. Some of them did talk. And all they needed to do was make the most basic proffer, and there is no case that I'm aware of in any court that suggests that requesting a proffer is an abuse of discretion, particularly under these circumstances when there had been 10 witnesses who had no evidence. It was very clear that this was a phishing expedition, and all the hearing officer did was say, tell me what they're going to say. And the fact that the employer concedes that it could not make the most basic proffer, I think, settles the case. There's no prejudicial error here. They didn't know what these employees were going to say, and agency hearings cannot be used to dig around in the hopes that you're going to uncover something. All right. Eddie, thank you. Thank you. Counsel for petition. Thank you. I'll be brief. I think one of the things that we've heard a lot from both the board and the union here is that they wanted to mandate how Woodcrest strategically conducted the hearing. That's not what we've heard. We've heard a lot about it. Counsel, with all due respect, that's not what they said. You could have called any 15 witnesses you wanted. But what we wanted to do after having only sat through a day and a half of hearings, and it's only eight witnesses up until the lunch recess, not 10. But there were five more scheduled for Monday. There were, but what we had determined. And you walked out of the hearing. But what we had determined based upon the evidence that was currently before us was that we needed to seek the testimony of Mr. DiDio's, those six individuals who were selected. We weren't asking. And the board says that one of those five employees for Monday was someone who worked for Virgil DiDio's. Is that correct? But it wasn't the testimony that we wanted to put on, Your Honor. But it did have an employee for Virgil DiDio's that was going to testify on Monday, not about Virgil DiDio's? But it wasn't that it wasn't about Virgil DiDio's, Your Honor. It was we had selected six specific individuals whom all we wanted the hearing officer to do was the ministerial task of issue a subpoena and then decide whether or not that subpoena should be revoked. Did you have some basis for thinking those six were different than the other remaining 18 employees? Well, Your Honor, that's a good question. It's a yes or no answer. Well, we had a reasonable belief. We didn't know because we couldn't. But you told me the reason. We had this conversation earlier. The only reason you gave me was that they worked for Virgil DiDio's. Yeah, and that was the reasonable belief that we had was that they would provide testimony about what Mr. DiDio's actually did or did not say. But we were precluded from allowing to go down that path because the hearing officer required direct knowledge. So let me ask you. In your brief, you make representations as to what these witnesses would have said. What's your basis for making those statements? I don't think it's any different than what we had said before. I think it's the reasonable belief. Your client told the hearing officer he didn't know. Right, and I think. So how do you know? I think what the board tries to do in its brief in the union is misconstrue some of that. No, I'm focusing on your brief. Yeah, and it's. No, I think this is serious, counsel. I read your brief, and I thought, well, all these witnesses were not heard from who had information that was relevant. And yet when I got into the transcript, that's not what your client told the hearing officer. Well, and I. So one answer you might give me was, Well, we put it in our pre-hearing statement that we gave to the regional director, but that was not your response earlier today. You still don't know what these witnesses would have testified, or at least you don't know that they would have supported the employer's position, do you? No, Your Honor, and we don't know what they would have testified to because it was a catch-22 that we were in. We couldn't. Before you go to the catch-22, to get this hearing, you made a submission to the regional director about supervisory misconduct, which my recollection is identified very guiltily as one of the supervisors, correct? Correct. And then, as I've now learned, as I'm learning all these processes. Actually, no, you don't mention him by name. But that underlying evidence is not something that's in the record that we have. But you know whom you identified to the regional director as the people who would have supported the claim against Fair Hill to do this. You know that. Did you call the people that you pointed out to the regional director? Did you call them during this first day and a half? Well, no, we started with the supervisors and some former administrators, Your Honor. Excuse me, go ahead. Were any of those that were on the submission made to the regional director either among the six that you wanted subpoenaed or among the five that were coming Monday? I don't believe that, Your Honor, any of those were the six that we'd subpoenaed. We decided to subpoena those six only after the testimony up until that second day before the lunch break. What about the five that were coming in on Monday? The five that were coming in on Monday were different witnesses. But the litigation strategy, what Woodcrest decided to do was simply shift based upon what Mr. De Dios' testimony was. That's why they wanted to get the six subpoenas, which was to simply hear what his subordinates would testify to because they had exercised their Johnny Pulcher rights. Do we know that, does the record indicate whether in the pre-hearing statement to the regional director the employer actually identified by name witnesses or did the pre-hearing statement read very much like the blue brief? I don't believe that's in the record, Your Honor. All right. So we don't know. And maybe all the regional director had was what was said in the blue brief. We have these witnesses who will testify. These four supervisors unlawfully interfered with the laboratory conditions for the election. And he took the regional director, took that on good faith and said, let's have a hearing. Let's give the employer an opportunity. Bring your witnesses in. And I think we were less than a day and a half into that hearing. How long did you think the hearing officer ought to sit there and listen to witnesses who had no direct knowledge to support your allegations? I'm just asking. You keep saying a day and a half. You know, I think the hearing is typically a couple of days. What we had determined was that we needed to see. How do you know that, counsel? I don't think. It might only be an hour. Yeah, no, and I don't think there's any set. No, but that's my point. Right. An hour and a half, a day and a half. It's not as though you were cut off at the pass. But it's not as if what Woodcrest was doing was a fishing expedition. We had six targeted. How do we know that? I'm sorry? How do we know that? Because we had six targeted subpoenas that we wanted to issue. But you didn't know who you just said to Judge Millett. You didn't know what they were going to testify to. We said on the record, and it's in the record. How did you pick those six? We picked those six as being the individuals who we thought had the most knowledge because they were Mr. DiDio's subordinates. But you had 24 subordinates. How did you pick those six out of the 24? I think those six were specifically picked, Your Honor. I don't think it's necessarily. It's not in the record with any great details. J.A. 6, the one that you just said. J.A. 6, when the regional director says you can have a hearing on the supervisory coercion, says the employer provided the names of several supervisory and bargaining unit employees whom it contends will testify to the environmental director, who was Ergel DiDio's, actively supported the union and did these things that we said he shouldn't have done. So you had employees whose supervisees that you thought at the time you made this representation the regional director would testify. But now you're telling me that you didn't call any of those in the first day and a half. You didn't subpoena any of those on this list of six, and none of those were the five that were supposed to come in on Monday. Is that right? I believe that's correct, Your Honor. I mean, what we had done was start with the supervisors. That's what led us to the fact on that second day before lunch. I got your strategy was start with supervisors. That was entirely your strategic call. The question is when you were ready for employees to testify, the ones you told the regional director you had were not on the list of six that you wanted to subpoena score, nor were they on the list of five that the hearing officer said you could bring in on Monday. Well, and I think... And your answer was yes, that's correct. Yeah, I believe that's correct, Your Honor. Maybe one of those witnesses of the five, but we didn't put those witnesses forward on Monday. We stopped the hearing because we weren't able to then call, based upon how the hearing had been conducted up to that point, now these six individuals whom we wanted to subpoena. No, but in the typical case, the employer would have said, Mr. Hearing Officer, I have Mr. Jones scheduled for Monday. He will provide the direct evidence you want, or if he won't, he will provide circumstantial evidence that we think demonstrates the case we're making. And that was never said. The thing that we say, Your Honor, is that... You just walked out. We're not participating anymore. Well, the thing that we said, Your Honor, was that we had a reasonable belief that these six individuals would have the testimony. We didn't have direct knowledge. We said we didn't have direct knowledge because we couldn't talk to those individuals. You could talk to them, counsel. You keep making that representation. You made in your brief that you interviewed 100 to 150 employees. And these individuals... And as far as I can tell, you interviewed them, so you knew what they were going to say. But the record is devoid of whether or not which individuals elected to... elected their Johnny Pulcher rights, right, not to speak with the employer. But you could have made all these proffers to the Hearing Officer. And you didn't do it. That's all I'm getting at. I mean, if you were cut off prematurely, why not tell the Hearing Officer so they can open the hearing and keep it going? But your client came in Monday morning and said, we're withdrawing from the hearing. Well, and I think that was a function of what happened the day before, Your Honor, during the lunch break, and might I add... But you know, counsel, you're not going to walk, abandon your client if you've got some evidence that can support the client's position. Well, it was because, Your Honor, we couldn't put the evidence forward that we felt we needed to put forward to... These people work for one of the supervisors. Yeah, and I think that what we needed was the individuals whom we wanted the subpoenas for. Okay. Anything further, Judge Brown? The 100 to 150 people you said you interviewed, do you mean by that you just asked them and they asserted Johnny Poultry or you were actually able to talk to those folks? Yeah, the record doesn't say what number of individuals actually spoke with the employer as opposed to those who exercised their Johnny Poultry rights, but what we do know... If any. But what we do know... Yeah, that's the interesting thing to me. But what we do know is that we had started to ask bargaining unit employees and they were, in fact, exercising their Johnny Poultry rights. I mean, we mentioned... But what I'm getting at, if I work for an employer and my supervisor, I'm being asked questions about my supervisor, I'm probably not going to want to say bad things about my supervisor since I have to work for him or her. But on the other hand, I want to get promoted in the company, so if I know something about the supervisor, I'm going to speak up and get on the good side of the company.  Or if you speak, never to say anything against your supervisor, it seems to me. The cases just don't support that. Even Medicare. Anything further? Did you challenge the direct evidence requirement in your brief here? I mean, I noticed that language when I'm hearing officer repeatedly, but I didn't understand your arguments to be that we could have proffered circumstantial evidence. No, I mean, the only thing... You didn't have either circumstantial or direct. No, what we said was the direct evidence was a higher burden that the hearing officer placed upon us. We reasonably believe that if we were offered the opportunity to question those individuals, that we would have had testimony that would have demonstrated that there was coercion. Did you say circumstantial? I guess I hadn't read in your briefs, and if I've missed it, I hadn't read that that was error, and that the test should have just been whether it was circumstantial. No, I don't think you missed that, Your Honor. I think it was the fact that the heightened vetting standard was the error. Thank you. We'll take the case under advisement.
judges: Rogers, Brown, Millett